## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| _____ ) | |
| ) | |
| **JEFFREY P. HOLMES,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Civil Action No. 16-10139-DJC** |
| ) | |
| **CAROLYN W. COLVIN,** ) | |
| **Acting Commissioner,** ) | |
| **Social Security Administration** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |
| ) | |
| _____) | |

## MEMORANDUM AND ORDER

**CASPER, J.**                                              **December 22, 2016**

## I.      Introduction

Plaintiff Jeffrey P. Holmes ("Holmes") brings this action pursuant to the Social Security

Act, 42 U.S.C. § 405(g), seeking judicial review of the final decision of Carolyn Colvin, Acting

Commissioner of the Social Security Administration ("the Commissioner"), issued by

Administrative Law Judge ("ALJ") Sean Teehan on August 24, 2014 denying his claim for Social

Security disability insurance benefits ("SSDI") with the Social Security Administration ("SSA").

D. 1; D. 13; R. 11, 37, 423.[1]  Holmes filed a motion to reverse the ALJ's decision, D. 13, and the

Commissioner filed a cross motion to affirm the ALJ's decision, D. 21.  For the reasons stated

_____

[1] "R." refers to citations to the administrative record, D. 10.

below, the Court DENIES Holmes's motion to reverse and ALLOWS the Commissioner's motion

to affirm.

## II.        Factual Background

Holmes was 57 years old when he first applied for disability benefits in 2010.  R. 423.  He

completed high school in 1970 and underwent training for refrigerator repair.  R. 96-97, 513.

Previously, Holmes worked as a receptionist, office support worker and mail clerk.  R. 103,

178.  His duties entailed reception work, answering the phone, servicing the copy machines and

distributing mail.  R. 103.  The copy machine and mail duties involved climbing stairs, kneeling,

walking up a steep hill and standing on a concrete floor, all of which caused him severe pain.  Id.

On January 15, 2010, Holmes filed an application for SSDI benefits, claiming that, as of

March 15, 2009, he was unable to work due to club feet.  R. 11, 271.  Holmes later clarified the

reasons for his inability to work to include lower back pain, poor vision, foot deformities and club

feet.  D. 13; D. 22; R. 252-60, 274-75.  Holmes then amended his disability onset date to January

1, 2011.  R. 11, 326.

## III.       Procedural History

After initial review of Holmes's SSDI application, the SSA denied his claim on May 12,

2010.  R. 11, 271-73.  Holmes requested reconsideration of his claim on May 25, 2010, R. 274,

and on November 29, 2010, the SSA again found Holmes to be ineligible for benefits, R. 275.  On

January 13, 2011, Holmes requested a hearing before an ALJ, R. 278, which was held on June 21,

2012, R. 11, 252.  In a decision dated June 29, 2012, the ALJ determined that Holmes was not

disabled within the definition of the Social Security Act and denied his claim.  R. 11, 260.  Holmes

appealed the ALJ's decision.  D. 1.  On October 11, 2013, the Appeals Council vacated and

remanded the case to the ALJ because of new evidence regarding Holmes's insurance status and

because the ALJ had assigned great weight to the consultative examiner's and state agency's opinions that had been obtained prior to Holmes's amended onset date. R. 266-69. The Appeals Council determined that these sources were not able to consider pertinent evidence for the relevant period when rendering their opinions. R. 267-69. On July 10, 2014, the same ALJ conducted a second hearing, R. 11-37, 268, and issued a written decision on August 25, 2014 that Holmes was not disabled, D. 1; R. 1-4, 11-37. The Appeals Council denied Holmes's second request for review on December 18, 2015. D. 1; R. 1-4. Holmes then filed a timely suit in this Court. D. 1; D. 13; D. 22.

## IV.    Legal Standard

### A.    <u>Entitlement to Disability Benefits and Social Security Income</u>

To obtain SSDI benefits, a claimant must prove that he has a "disability," defined by the Social Security Act as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A); <u>see</u> 20 C.F.R. § 404.1505. The impairment must be sufficiently severe, preventing the claimant from engaging in any of his previous work or any other gainful activity that exists in the national economy. <u>See</u> 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1505.

The SSA follows a five-step sequential analysis to determine whether an individual is disabled and thus whether the application for benefits should be approved. 20 C.F.R. § 404.1520(a); <u>see</u> <u>Seavey v. Barnhart</u>, 276 F.3d 1, 5 (1st Cir. 2001). First, the claimant cannot be engaged in substantial gainful work activity or the application will be denied. 20 C.F.R. § 404.1520(a). Second, without a severe medically determinable impairment or

combination of impairments, within the relevant time period, the claimant cannot be disabled and the application is denied. Id. Third, if the impairment meets or equals the conditions of one of the "listed" enumerated impairments in the Social Security regulations, the claimant is disabled and the application is approved. Id. Fourth, where the impairment does not meet the conditions of one of the listed impairments the SSA determines the claimant's residual functional capacity ("RFC"). Id. If the claimant's RFC allows him to still perform his past relevant work he is not disabled and the application is denied. Id. Fifth, if the claimant, given his calculated RFC, education, work experience and age, is unable to do any other work within the national economy he is disabled and the application is approved. Id.

### B.     Standard of Review

This Court may enter "a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). Judicial review is limited, however, "to determining whether the ALJ used the proper legal standards and found facts upon the proper quantum of evidence." Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 655 (1st Cir. 2000). Even where the record "arguably could justify a different conclusion," the Court must accept the Commissioner's findings of fact if they are "supported by substantial evidence." See Whitzell v. Astrue, 792 F. Supp. 2d 143, 148 (D. Mass. 2011) (quoting Rodriguez Pagan v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987)) (internal quotation marks omitted); see also 42 U.S.C. § 405(g). Substantial evidence exists "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [the Commissioner's] conclusion." Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (quoting Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)) (internal quotation mark omitted).

4

The Commissioner's factual findings, however, "are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts." Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (citations omitted).  Thus, if the claimant demonstrates that the ALJ made a legal or factual error, Manso-Pizarro v. Sec'y of Health & Human Servs., 76 F.3d 15, 16 (1st Cir. 1996), "the court may reverse or remand such decision to consider new, material evidence or to apply the correct legal standard," Martinez-Lopez v. Colvin, 54 F. Supp. 3d 122, 129 (D. Mass. 2014) (citation and internal quotation mark omitted); see 42 U.S.C. § 405(g).

## V.      Discussion

### A.      Before the ALJ

#### 1.      Medical History

The ALJ considered extensive evidence regarding Holmes's medical history, including treatment records, assessments and diagnoses and testimony from Holmes and his physician regarding his foot deformities and back pain. R. 11-37, 639-872.

##### a.      Foot Deformities

Holmes was born with club feet requiring him to wear corrective casts from birth until approximately age four. R. 17, 639. Despite never receiving corrective surgery, Holmes did not see a podiatrist until 2011, at the age of 58. R. 18, 689-90. During his initial January 12, 2011 visit with the podiatrist, Dr. Heffernan, Holmes complained of painful collapsed flat feet that caused discomfort especially with any significant standing or walking activities. R. 18, 689-90. Holmes had been wearing mid-rise leather walking shoes or boots and had found some mild benefit with wearing cushioned, over-the-counter arch supports, but he had not used any custom orthotic devices or bracing as an adult. R. 18, 689.

5

At that first visit, Dr. Heffernan observed Holmes's walking and saw no significant "antalgic gait" but noted "significant collapse of the medial longitudinal arches."  R. 18-19, 689-90.  Dr. Heffernan also observed, among other things, that Holmes had extremely tight gastroc and soleus muscles with ankle joint dorsiflexion limited to only two to three degrees with the knees extended.  R. 19, 689.  He further observed limited subtalar joint range of motion.  Id.

Based upon his examination and observations of Holmes, Dr. Heffernan recommended higher quality over-the-counter orthotic devices, custom orthotic devices and more supportive ankle-foot orthotics ("AFOs") in place of the cushioned footwear Holmes had been using.  Id.  Dr. Heffernan discussed surgical intervention and the benefits of performing daily static stretching for tight muscles and ordered x-rays.  Id.

Holmes returned for a second visit to Dr. Heffernan on February 22, 2011 after having purchased over-the-counter orthotic devices.  R. 19, 699.  Dr. Heffernan deemed these insufficient to counter the significant foot collapse.  Id.  Dr. Heffernan again advised Holmes of the need for more supportive AFOs and offered to determine if they were covered by his insurance plan. R. 19-20, 699.

At Holmes's visit on March 16, 2011, Dr. Heffernan noted that Holmes had been fitted for AFO braces, but insurance issues had prevented Holmes from getting them at that time. R. 20, 703.  The doctor recommended temporary New Balance orthotics until Holmes could get the AFO devices.  Id.

On May 6, 2011, Kent VanHeukelom, a certified orthoptist indicated that he had fitted Holmes with bilateral custom molded ankle foot braces which should prevent his deformity from worsening if worn every day when walking or standing.  R. 20, 684.  At his next visit with Dr. Heffernan on May 17, 2011, Holmes reported that he found the AFO braces uncomfortable and

ill-fitting.  R. 20, 706-07.  Dr. Heffernan observed Holmes walk with a slight antalgic gait when wearing the AFO braces.  Id.  Dr. Heffernan advised Holmes to seek a modification of the braces from the manufacturer.  Id.  A May 23, 2011 follow-up letter by Dr. Heffernan stated that Holmes had significant collapse of both feet in stance and with all weight-bearing/walking activities making it impossible to perform work activities involving standing, walking or lifting without pain.  R. 20, 677.  The letter further stated that Holmes's use of appropriate footwear, orthotic devices and custom AFOs over the past four months had not provided significant improvement in weight bearing discomfort/pain and left Holmes with a disability lasting longer than one year without the ability to be gainfully employed.  Id.

Holmes returned with properly fitted orthotic devices for his next visit to Dr. Heffernan on June 15, 2011.  R. 20, 710.  At a visit on July 27, 2011, Holmes reported that, while wearing his orthotic brace devices on a regular basis, he had no significant problems and experienced less pain but still had some difficulty with increasing his stamina for walking.  R. 20, 713.  Dr. Heffernan also treated callus formation along the bottom side of Holmes's great toes by shaving the pinch calluses smooth.  Id.

During a visit on October 3, 2011, Holmes reported that he had recently developed pain at the left arch area from when he had attempted a brief walk without the AFO braces. R. 21, 716.  Dr. Heffernan observed that Holmes had a "slight slow gait" with the AFO braces and advised Holmes to wear them with supportive shoes for all weight-bearing activities.  Id.  Dr. Heffernan made a similar observation and recommendation at a subsequent visit on December 1, 2011.  R. 21, 719.

At the April 4, 2012 visit, Dr. Heffernan observed that Holmes had no significant distress with walking.  R. 23, 806-07.  Dr. Heffernan further noted that Holmes continued to walk with a

7

rather slow gait with use of the customized AFOs, experiencing mild pain with deep palpitation over the medial arch areas over the posterior tibial tendons at the navicular tuberosity insertion sites. Id. Holmes's muscle tightness and ankle dorsiflexion remained the same as prior visits. Id. Dr. Heffernan wrote that some mild wear and tear at the distal sole of Holmes's shoes indicated that the AFOs were likely helping Holmes to maintain a more proper position of the feet during weight bearing and gait. Id.

On May 24, 2012, Holmes told Dr. Heffernan that any attempts at brief weight bearing without the AFO braces caused more severe pain and an inability to walk. R. 23, 808. Dr. Heffernan observed that Holmes had a very slow gait with the use of the AFOs as well as all the previously identified with the same level of severity. Id.

On August 8, 2012, Holmes complained of pain with ambulation with any extensive walking without the AFO braces and an inability to walk any long distance comfortably, even with the braces. R. 24, 810. Dr. Heffernan noted that Holmes did not present with any acute distress, but walked with a slow gait. Id. On February 13, 2013, Holmes's symptoms remained the same except that Dr. Heffernan noted that Holmes was "generally doing quite well with ambulation." R. 24, 811.

On October 31, 2013, Holmes complained of worsening problems regarding endurance and his ability to walk, stating that he could barely walk two blocks without having to stop and sit down. R. 25, 813. Holmes described significant tightness, cramping and pain sensations in his calf muscle areas during and after walking activities. Id. Dr. Heffernan noted that Holmes seemed to have more significant pain standing in bare feet in relaxed position and also had more antalgic pain walking with the AFO braces in the hallway. Id. Further x-rays were taken to evaluate any increased degenerative changes compared to the prior x-rays from 2011. Id.

On December 2, 2013, Holmes complained of increasing difficulty in his ability to walk and having no endurance with walking or standing activities. R. 25, 815. Holmes continued to describe significant tightness in the calf muscle areas at both legs with cramping and pain sensations during and after walking activities. Id. Dr. Heffernan noted that Holmes was in no acute distress, but did have noticeable significant pain with weight bearing in a relaxed stance and while walking even when wearing the custom AFO devices. Id. Dr. Heffernan compared Holmes's recent October 31, 2013 x-rays with x-rays from January 2011 which revealed slightly increased joint space narrowing at the right first metatarsophalangeal joint with increased sclerosis at the base of the proximal phalanx of the right great toe, significant metatarsus adductus at the right foot with lowering of the calcaneal inclination and significant pea planus deformities bilaterally. R. 25-26, 815. Dr. Heffernan noted that the x-rays of the left foot revealed significant pea planus and collapse of the medial longitudinal arch and midfoot articulations. Id. Dr. Heffernan discussed a possible referral for a surgical consultation regarding reconstructive foot surgery with Holmes, but Holmes preferred not to consider any surgical procedures at that time. R. 26, 815.

On March 3, 2014, Holmes reported increased difficulty in walking any significant distances and problems with endurance with standing and walking activities. R. 27, 817. Dr. Heffernan found that ankle joint dorsiflexion at this point was limited to one to two degrees at the right ankle and negative one degree at the left ankle with subtalar joints maintained in neutral position. Id. Dr. Heffernan was unable to get the left ankle joint to neutral position with the left knee extended and was just barely able to achieve some dorsiflexion at the left ankle with the knee at ninety degrees of flexion. Id.

On June 9, 2014, Kent VanHeukelom, the orthoptist, wrote that he had seen Holmes on April 28, 2014 to increase the medial arch correction in both of his custom AFO braces. R. 29, 842.  A second adjustment was made on May 19, 2014.  Id.  VanHeukelom reported that if Holmes wore both AFOs daily, all day, that they would hopefully slow the progression of his deformity.  Id.

On June 16, 2014, Dr. Heffernan reported that Holmes had an "extreme limitation of the ability to walk, with impairments that seriously interfere with his ability to independently initiate, sustain and complete activities."  R. 30, 862-63.

b.      Back Pain

On January 19, 2011, Holmes had his initial evaluation with Tessa Rowin, a physical therapist, for his chronic low back pain.  R. 19, 757-60.  Holmes reported that his pain intensified when sitting in a bent over position and that it was hard to find a good sleeping position.  Id.  He also reported that his pain was alleviated by lying on his stomach or side.  Id.  He stated that he had two weeks of relief after chiropractic work, but no long-term effect after eight months of treatment.  Id.  Holmes rated his pain as a three out of ten.  Id.  He stated that he experienced back pain with cleaning, especially "getting under things" and scrubbing for extended periods of time and that he became tired after walking a quarter of a mile.  Id.

Holmes had further physical therapy sessions on January 28, January 31, and February 7, 2011.  R. 19, 751, 753, 755.  At the February 7th session, Ms. Rowin noted that Holmes had been experiencing back pain for two to three years and it had progressed over time such that it limited Holmes from full participation in daily activities due to biomechanical musculoskeletal pain from compressive loading of lumbar facet joints secondary to muscular tightness.  R. 19, 751.

10

A MRI, dated November 23, 2011, showed a mild disc bulge at the L4-L5 vertebrae, prominent degenerative changes in the right L4-L5 facet joint with a small synovial cyst arising from the posterior aspect of the joint space and degenerative changes at the L5-S1 facet joints bilaterally.  R. 21, 722.

Holmes returned to physical therapy on December 12, 2011 for the first time since February 2011 following this MRI.  R. 21.  He reported that he had been doing his exercises from prior physical therapy, but they did not help his pain.  R. 21, 747-49.  Holmes saw Ms. Rowin several more times over the next two months with a final visit on February 9, 2012.  R. 22, 732-46.

On December 31, 2013, Holmes met with Deniz Ozel, M.D. for an evaluation of his chronic low back pain and lower extremity foot deformities.  R. 26, 782-84.  Dr. Ozel's report noted that Holmes had impaired sitting and standing tolerances.  Id.  Holmes informed Dr. Ozel that his pain rated an eight out of ten at its worst, a two out of ten at its best and, on average, a three out of ten in the lower back.  Id.  He described the back pain as a dull ache on both sides, right more so than left, with no radiation.  Id.  The pain felt worst with sitting or standing; he was most comfortable lying supine or prone.  Id.  He reported that his standing tolerance was about ten minutes, his walking tolerance was two to three blocks without stopping and his sitting tolerance was fifteen minutes using an adjustable computer chair.  Id.  Dr. Ozel examined Holmes's spine and found it to be straight with a relatively level pelvis with some hyperlordosis of the spine in the lumbosacral area.  R. 26-27, 782-84.  Dr. Ozel opined that Holmes's chronic low back pain was likely secondary to degenerative facet disease and strain related to his biomechanics and that his long history of foot and ankle problems and trunk weakness had contributed to his ongoing chronic pain.  R. 27, 782-84.  Dr. Ozel prescribed a Lidoderm patch to the lumbosacral spine to help with pain

management and referred Holmes to physical therapy including aquatic therapy with stretching exercises.  Id.

Holmes returned to Dr. Ozel on February 4, 2014.  R. 27, 828-29.  He reported that he could not get the Lidoderm patch approved through his insurance company and that he had been completing stretching and physical therapy as prescribed, but that he was not feeling any improvement in pain or activity tolerance.  Id.  Upon examination of Holmes, Dr. Ozel observed very limited range of motion of the lumbar spine, very tight hamstrings and heel cords, "strength on manual muscle [] show[ing] diffuse weakness of around 4+/5 especially for ankle DF" and "a very slow gait pattern with left hip external rotation and reduced vertical excursion."  Id.  Dr. Ozel recommended a trial of Gabapentin for pain.  Id.

At Holmes's visit on March 4, 2014, he stated that he initially had an excellent response to Gabapentin, but then the pain returned.  R. 28, 820-21.  Dr. Ozel instructed Holmes to increase the dosage over a set period of time and, as of his visit on April 1, 2014, Holmes reported feeling less back stiffness in the morning, although it returned later in the day.  R. 29, 836-37.  Holmes returned to Dr. Ozel on May 27, 2014 and reported feeling "woozy" on the increased dose of Gabapentin, but had little benefit from the lower dose.  R. 29, 839-40.  Dr. Ozel advised Holmes to wean himself off of Gabapentin if it was not helping with his pain.  Id.

2.      *ALJ Hearing*

During the second administrative hearing[2] held on July 10, 2014, the ALJ heard testimony

from Holmes, treating podiatrist Dr. Heffernan, medical expert Dr. John W. Axline and vocational

expert ("VE") Robert G. Laskey.  R. 11.

a.      Holmes's Testimony

Holmes testified that he previously worked in a mail room, as a lab rodent cage washer at

a medical school and as an office support worker/receptionist.  R. 99, 101, 103.  He last worked

for three hours at a temporary job in June 2012, but could not sit or stand for a sustained period

due to pain in his feet, legs and lower back.  R. 30, 97.

Holmes's most recent work was at the Unitarian Universalist Association ("UUA").  R.

102-03.  Holmes testified that he performed a variety of tasks there:

> I did reception work, I answered the telephone.  I also serviced the Xerox machines
> which is a very taxing job . . . .  I had to walk up and down the stairs for hours every
> day with this big bundle of Xerox paper under one arm, and go down the hall and
> kneel in front of the machine and push the button and the drawer comes out and I
> put in fresh paper and all this kind of thing.  That was pretty much a constant job
> and it was, it was absolutely, it killed my back.  It killed my back and my feet and
> walking down the stairs.  I had trouble going downstairs.  I have to sort of turn into
> the railing and hang onto the railing very solidly and feel my way down.

R. 103.  He further testified that his mail room duties at the UUA included walking to a different

building and standing on a concrete floor with no mats.  Id.

As to his home life, Holmes testified that he lives on the third floor of an apartment

building.  R. 31, 106.  He must climb two flights of stairs to get to and from his apartment and an

---

[2] The first administrative hearing and the Appeals Council decision are not relevant to the cross-motions at issue.

additional flight down to the basement when he does laundry.  Id.  He has a laundry bag that he "bumps" up and down the stairs as it hurts his lower back to carry uneven weight.  Id.

Holmes further testified that he can sometimes prepare a simple meal, can clean his apartment using long-handled mops and brooms and can spend fifteen minutes per day checking his e-mail and paying bills on the computer.  R. 31, 107, 109-10.  He leaves his apartment approximately every third day.  R. 31, 108.  When leaving his apartment, Holmes will rarely go farther than a few blocks.  R. 107-10.  He walks to the local library a few times per month, but rests frequently along the way and sits down as soon as he arrives at the library.  R. 31, 108.  He travels to the corner store/supermarket once or twice per week by bus.  R. 31, 107-08.  The supermarket is located four blocks away, but he is unable to walk that far without pain.  Id.  Holmes testified that he has to take the bus even for short trips.  Id.   While he can "whip around" the supermarket in ten to fifteen minutes, there is sometimes a long line at the cash register so that the the pain in his feet and lower legs builds to the point that as soon as he gets to the bus stop he must sit on the bench and raise his feet off the ground.  R. 111.

Holmes testified that his pain prevents him from doing any sustained activity and that he has to shift and move positions constantly to provide any relief.  R. 112, 118.  He uses a variety of home remedies for pain.  R. 118-21.  Holmes testified that he used Gabapentin as prescribed by Dr. Ozel, but that it failed to provide any long-term, significant relief and caused him to experience undesirable side effects leading him to discontinue its use.  R. 30, 121.

b.      Dr. Heffernan's Testimony

Dr. Heffernan testified that he had been Holmes's treating podiatrist since January 12, 2011 and had seen Holmes at seventeen appointments, the most recent being one month before the hearing.  R. 31, 122-23.

14

In response to the ALJ's questions, Dr. Heffernan explained the reasoning behind his prior RFC reports that Holmes cannot walk for more than five minutes, needs to shift at will and be able to take unscheduled breaks.  R. 31.  Dr. Heffernan admitted that the majority of his support came from Holmes's subjective complaints and some observation of Holmes during appointments. R. 31, 124, 126-27.  He testified that many foot conditions can affect the knees, hips and lower back, but also acknowledged that Holmes's back problems were out of his area of expertise. R. 31, 138-39.  The remainder of Dr. Heffernan testimony included a recap of his findings during his seventeen appointments with Holmes.  R. 31, 131-38; see supra Section V.A.1.a.

c.      Dr. Axline's Testimony

The medical expert, Dr. Axline, a licensed orthopedic surgeon in New York,[3] testified (telephonically) that he had not examined Holmes, but had reviewed the record. R. 32, 140-47.

Dr. Axline summarized Holmes's medical issues as:  (1) degenerative disc disease of the lumbar spine which is minimal in degree and not associated with any neurologic deficit, R. 149, and; (2) pes planus (flat feet), R. 152.  Dr. Axline testified at length regarding how Holmes's impairments did not meet SSA listings, R. 152, 155, 156, and the ALJ asked him about Holmes's exertional and/or non-exertional limitations based upon the medical record, R. 156.  Dr. Axline spent some time discussing the lack of evidence for the balance and visual issues which had not been previously identified as severe impairments.  Id.  He further discussed Holmes's tight calf muscles in detail.  R. 157, 167-68.

_____

[3] Dr. Axline does not currently see patients.  R. 143.

Dr. Axline recommended a job limiting Holmes to lifting ten pounds frequently and twenty pounds occasionally, as a precautionary measure, because people who have degenerative disc disease do well if limited to that range.  Id.  He found no limit to sitting based upon the objective findings.  Id.  Acknowledging the difficulties Holmes experiences with his legs using the AFOs, Dr. Axline recommended no more than one hour of standing at a time for four hours per work day and no more than one hour of walking at a time for four hours per work day.  R. 33, 157.

In providing his opinion, Dr. Axline relied upon the progress notes of Holmes's treating physicians, as well as the lower back MRIs and foot x-rays taken at various times during the period at issue.  R. 32, 153-54, 158, 160.  Holmes's attorney challenged Dr. Axline's interpretation of these objective records, claiming that Dr. Axline incorrectly ignored Holmes's complaints of pain and discomfort that appeared potentially consistent with the objective findings.  R. 33, 162-65.

d.    Vocational Expert's Testimony

The VE testified that Holmes's past work consisted of:  office helper, an unskilled job with a Specific Vocational Preparation ("SVP") of 2, as light work; receptionist, a semiskilled job with an SVP of 4, as sedentary work; and mail clerk, an unskilled job with an SVP of 2, as light work.  R. 178-79.  The ALJ asked the VE hypothetical questions about work capacity.  R. 180-83.  Each question assumed an individual of Holmes's age, education and work experience.  Id.  The ALJ first asked the VE to consider someone who is:

> able to lift and carry twenty pounds occasionally and ten pounds on a frequent basis. Would be able to sit for eight hours out of an eight hour work day.  Would be able to stand for one hour at a time for a total of four hours in an eight hour work day. Would be able to walk for one hour at a time for a total of four hours in an eight hour work day.  This person would occasionally be able to climb stairs and ramps, never ropes, ladders and scaffolds.  Would occasionally be able to stoop and crouch and would frequently be able to push and pull with the bilateral lower extremities. This person would have to avoid concentrated exposure to unprotected heights and

16

dangerous machinery.  Those would be the limitations.  Would such a person be
able to perform any of the past work of the claimant?

R. 180.  The VE testified that of Holmes's past work, the only job that would fall within those

limitations would be the receptionist job.  Id.  The ALJ asked whether any skills would have been

acquired in the performance of receptionist work and the VE replied:

> [Y]es.  Primarily clerical skills.  Other skills would involve having a service
> orientation, actively looking for ways to help people.  Understanding written
> sentences, paragraphs in work-related documents.  Communicating effectively with
> others.  These are just representative skills and knowledge components.  Indicating
> certainly a knowledge of administrative and clerical procedures such as word
> processing systems, filing and records management.  Those would be some
> common skills that would be related to the job of a Receptionist.

R. 181.  The ALJ then asked if there would be any jobs other than receptionist in the regional or

national economy that would utilize the "readily transferable skills that you've indicated?"  R. 182.

The VE testified that there would be other jobs with those skills, including appointment clerk, a

semiskilled job, SVP of 3, as sedentary work; information clerk, a semiskilled job, SVP of 4, as

sedentary work; and a credit reporting clerk, a semiskilled job, SVP of 4, as sedentary work.

R. 182-83.  The ALJ asked whether the job of travel clerk might be included in that grouping.

R. 183.  The VE declined to include that job because it would likely take additional training and

would not be readily transferable from a receptionist position.  R. 183-84.

The ALJ posed a second hypothetical:

> This person would be able to sit for one hour at a time for a total of six hours out
> of an eight hour work day.  Would be able to stand for fifteen to thirty minutes at a
> time for a total of three to four hours in an eight hour work day.  Would be able to
> walk for fifteen to thirty minutes at a time for a total of three to four hours in an
> eight hour work day.  Would be able to lift and carry twenty pounds occasionally
> and ten pounds frequently.  Would occasionally be able to climb stairs and ramps,
> never ropes, ladders and scaffolds.  Would be able to occasionally balance, stoop,
> crouch, kneel and crawl.  Would occasionally be able to use the lower, bilateral []
> extremities for pushing and pulling.  Would have to avoid concentrated exposure

to unprotected heights and dangerous machinery. Would the jobs available for the hypothetical person number one be available for that hypothetical person as well?

R. 185. The VE responded that the same jobs would be available to both hypothetical people from question one and question two. R. 185-86.

The ALJ then provided a third hypothetical:

This person would frequently experience pain or other symptoms severe enough to interfere with attention and concentration needed to perform even simple work tasks. Would be able to sit for fifteen minutes at a time for a total of less than two hours in an eight hour work day. Would be able to stand for five minutes at a time for a total of less than two hours in an eight hour work day. This person would be unable to walk more than five minutes at a time. This person would be required to shift positions at will from sitting to standing and walking and would have to take unscheduled breaks during an eight hour work day for ten minutes every thirty minutes. Would rarely be able to lift less than ten pounds, and would be able to rarely carry less than ten pounds. This person would occasionally be able to look down, would rarely be able to twist, stoop or climb stairs, and would be absent from work about four days per month. Would such a person be able to perform any work in the regional or national economy?

R. 186. The VE replied that such limitations would preclude all work activity. Id.

Holmes's counsel primarily questioned the VE about the specific limitations that Holmes had testified that he experienced. R. 187-91.

*3.      Findings of the ALJ*

Following the five-step analysis, 20 C.F.R. § 404.1520, at step one, the ALJ found that Holmes had not engaged in substantial gainful activity since January 1, 2011, the amended disability onset date. R. 14. At step two, the ALJ found that Holmes's foot deformities and mild degenerative disc disease of the lumbar spine constituted severe impairments. Id. At step three, the ALJ determined that these impairments did not meet one of the listed impairments in the Social Security regulations. R. 15. At step four, the ALJ determined that Holmes had the RFC to:

[P]erform sedentary to light work as defined in 20 CFR 404.1567(a)(b) except he is able to lift and/or carry twenty pounds occasionally and ten pounds frequently.

He is able to sit for eight hours in an eight hour workday.  He is able to stand for one hour at a time for a total of four hours in an eight hour workday.  He is able to walk for one hour at a time, for a total of four hours in an eight hour workday.  He can never climb ladders, ropes or scaffolds, but can occasionally climb stairs or ramps, stoop or crouch.  He can frequently push or pull with his bilateral lower extremities.  He must avoid concentrated exposure to unprotected heights and dangerous machinery.

R. 16.  Based upon this RFC, the ALJ concluded that Holmes is able to perform his past relevant work, specifically as a receptionist.  R. 35.  As an alternative conclusion, at step five, the ALJ found that Holmes had acquired skills from his past relevant work that would be transferable to other administrative occupations with jobs existing in significant numbers in the national economy. R. 36.  Accordingly, the ALJ determined that Holmes was not disabled as defined by the Social Security Act.  R. 37.

### B. Holmes's Challenges to the ALJ's Findings

Holmes seeks reversal of the ALJ's decision or, alternatively, remand to the ALJ. D. 13 at 30.  Holmes challenges:  (1) the weight afforded to treating physiatrist Dr. Ozel's opinion; (2) the ALJ's conclusion that Holmes is capable of performing his past relevant work; (3) the ALJ's conclusion that Holmes can perform other semi-skilled jobs which would require little, if any, vocational adjustment from his prior work, and; (4) that the ALJ's decision was not supported by substantial evidence.  Id. at 1, 18, 20, 25, 28.

### 1. The ALJ Did Not Err in Determining the Weight Given to Dr. Ozel's Opinion

Holmes argues that the ALJ erred by not giving controlling weight to Dr. Ozel's opinion as a treating physician.  D. 13 at 18-20.  Holmes asserts that the ALJ focused upon Holmes's subjective reporting of his limitations and failed to provide substantial evidence supporting his

decision.  Id.  Thus, Holmes argues that the ALJ erroneously gave Dr. Ozel's opinion little weight.

Id.

The ALJ gave Dr. Ozel's opinion little weight because:  (1) "Dr. Ozel's treatment records suggest that her opinions were based upon the claimant's reports," and; (2) "there is no support for Dr. Ozel's opinion that the claimant's functioning had decreased by June 18, 2014" as Holmes "told Dr. Ozel that he was walking a few blocks at a time running errands around his neighborhood, which is inconsistent with the limitations expressed by Dr. Ozel."  R. 34.

In light of the record, the ALJ did not err in giving Dr. Ozel's opinion little weight.  It is well settled that an ALJ is not required to accept a treating physician's opinion.  Hill v. Colvin, No. 13-cv-11497-DJC, 2015 WL 132656, at *7 (D. Mass. Jan 9, 2015) (citing Guyton v. Apfel, 20 F. Supp. 2d 156, 167 (D. Mass. 1998)).  A treating physician's opinion regarding a claimant's impairment is given "controlling weight" only if that opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [a claimant's] case record."  20 C.F.R. § 404.1527(c)(2).  As such, an ALJ may "downplay" the weight afforded to a treating physician's opinion where it is "inconsistent with other evidence in the record including treatment notes and evaluations by examining and nonexamining physicians."  Gosse v. Colvin, No. 14-cv-14066-LTS, 2015 WL 7253679, at *9 (D. Mass. Nov. 17, 2015) (quoting Arruda v. Barnhart, 314 F. Supp. 2d 52, 72 (D. Mass. 2004)) (internal quotation mark omitted).

Where an ALJ determines that the opinion of a treating source is not entitled to controlling weight, the ALJ considers six factors to assess the proper weight to give the opinion:  (1) length of the treatment relationship and frequency of examination; (2) nature and extent of the treatment relationship; (3) supportability of the treating source's opinion; (4) consistency of the opinion with

the record as a whole; (5) specialization of the treating source, and; (6) other factors that tend to support or contradict the opinion.  20 C.F.R. § 404.1527(c)(2)(i)-(ii), (c)(3)-(6).  An ALJ is not required to expressly consider the six factors in his or her decision but the decision must include "good reasons" for the weight given to the treating source.  See Bourinot v. Colvin, 95 F. Supp. 3d 161, 177 (D. Mass. 2015) (citing 20 C.F.R. § 404.1527(c)(2)).  An ALJ provides "good reasons" where the decision is "sufficiently specific to inform both the claimant and this reviewing Court of how each treating source opinion was evaluated."  Id.

In considering the relevant factors, 20 C.F.R. § 404.1527(c), the ALJ provided good reasons for not giving Dr. Ozel's opinion controlling weight, R. 34, and the ALJ's determinations are supported by substantial evidence in the record.  Although the ALJ did not explicitly consider all six of the weighted factors, his analysis of several of them is sufficient to demonstrate how Dr. Ozel's opinion was evaluated and substantial evidence supports the ALJ giving it little weight. See Mendes v. Colvin, No. 14-cv-12237-DJC, 2015 WL 5305232, at *7 (D. Mass. Sept. 10, 2015). Specifically, the ALJ considered the subjective nature of Dr. Ozel's treatment records and the lack of medical support for Dr. Ozel's opinion that Holmes's functioning had decreased as of June 18, 2014 as it is inconsistent with the testimony of Holmes and the record as a whole.  R. 34.

The ALJ assessed the first RFC completed by Dr. Ozel on March 4, 2014.  Id.  The ALJ found that the first RFC "was clearly completed by Dr. Ozel at a visit with the claimant" and that "Dr. Ozel's treatment records suggest that her opinions were based on the claimant's reports, as she has noted his 'self-reported' walking and sitting tolerances."  Id.  In support of this, the ALJ points to Dr. Ozel's March 4, 2014 clinical progress note, R. 820, which indicates "by [Holmes's] report" difficulty in ambulation and prolonged sitting of greater than ten minutes, id.  In the next paragraph of the progress note, Dr. Ozel observes that Holmes walks slowly, but without acute

pain and that he sat for about fifteen to twenty minutes during the examination without having to move or change positions.  Id.  After Holmes's visit on March 4, 2014, Dr. Ozel completed an RFC that concluded that Holmes could not sit for more than fifteen to thirty minutes at a time and needed to walk around every twenty minutes.  R. 788-89.  The record indicates that Dr. Ozel formed this opinion despite a lack of objective diagnostic testing.  See id. at 787.  The ALJ considered Dr. Ozel's reliance on Holmes's self-reported limitations in support of his finding that Dr. Ozel's RFC only reflected what Holmes told her, without sufficient additional medical support for her opinions.  R. 34.

The ALJ next considered the second RFC that Dr. Ozel completed on June 18, 2014 that further reduced Holmes's ability to sit from fifteen to thirty minutes at a time to ten to twenty minutes at a time.  R. 34, 788-89, 866-67.  At a visit on May 27, 2014, Holmes reported to Dr. Ozel that he could walk a few blocks at a time and run errands around his neighborhood, which the ALJ believed to be inconsistent with the increased limitations expressed by Dr. Ozel in the June 18th RFC.  R. 34.  Although the ALJ did not provide a detailed analysis of why he believed the opinion to be inconsistent, he did point to the inconsistency with the other substantial evidence in the record as a whole, namely Holmes's own prior representations to Dr. Ozel that he could run errands and walk several blocks and his average self-reported pain of three out of ten, as a reason to provide Dr. Ozel's opinion with little weight.  Id.  The ALJ's conclusion is thus supported by substantial evidence in the record.  Id.; see Irlanda Ortiz, 955 F.2d at 769.  The ALJ provided good reasons and specific findings in considering the consistency of Dr. Ozel's opinion with the record as a whole and determined that the opinion should not be given controlling weight.  See 20 C.F.R. § 404.1527(c)(2); Bourinot, 95 F. Supp. 3d at 177; R. 34.

>    2.    *Holmes's Claim That the ALJ Improperly Characterized His Past Relevant Work is Moot*

The SSA argues that because Holmes never raised the issue of his work being a "composite job" at any level during the administrative process it should be considered waived before this Court.  D. 22 at 21-22.  The First Circuit has held that objections not presented to the ALJ are waived.  Soto-Cedeño v. Astrue, 380 F. App'x 1, 4-5 (1st Cir. June 29, 2010) (citing Mills v. Apfel, 244 F.3d 1, 8 (1st Cir. 2001)); see Bonner v. Colvin, 153 F. Supp. 3d 465, 477 (D. Mass. 2015) (citing Soto-Cedeño and Mills in concluding that issue not raised before ALJ was waived).  Accordingly, because Holmes failed to raise the composite job issue before the ALJ, it is waived here.  See id.

Even if Holmes's argument was not waived, and, assuming *arguendo*, this Court found his prior work to be a composite job, the error would be harmless.  The ALJ correctly concluded at step five that there existed other jobs that Holmes was capable of performing.  See Hatch v. Colvin, No. 12-cv-40163-DHH, 2016 WL 4197578, at *10 n.30 (D. Mass. Aug. 9, 2016); see also Past Relevant Work (PRW) as the Claimant Performed It, SSA POMS DI 25005.020[4] at B (2011) (stating that "[a]t step 5 of sequential evaluation, a claimant may be able to use skills he or she gained from a composite job to adjust to other work").  As discussed below, this Court finds no error in the ALJ's analysis at step five and thus Holmes's composite job argument does not otherwise aid his contentions.  See Hatch, 2016 WL 4197578 at *10 n.30; see also Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 656 (1st Cir. 2000).  As such, there is no need to address the merits of

---

[4] Available at https://secure.ssa.gov/apps10/poms.nsf/lnx/0425005020.

Holmes's composite job argument in the face of waiver under Mills, see 244 F.3d at 8, and harmless error in light of the ALJ's alternative finding, see Ward, 211 F.3d at 656.

>    3.    *The ALJ Did Not Err in Determining That Holmes Can Perform Other Semi-Skilled Jobs with Very Little, If Any, Vocational Adjustment*

Holmes argues that the ALJ failed to comply with 20 C.F.R. § 404.1568(d)(4) by not properly asking the VE about the transferability of Holmes's skills with regard to vocational adjustment. D. 13 at 25-27.  That is, Holmes asserts that he should have been found disabled as a matter of law based upon the Medical-Vocational Guidelines ("the Grids") set forth by the Commissioner. Id.; see § 404.1568(d)(4); 20 C.F.R. Pt. 404, Subpt. P, App. 2, §§ 201.04, 201.06, 202.04, 202.06.

The Grids laid out in Appendix 2 to Subpart P of Part 404 are used by ALJs and the SSA to determine if, based upon the given RFC and the claimant's background, the SSA must find a claimant disabled.  20 C.F.R. Pt. 404, Subpt. P, App. 2.  Each row in the Grids considers age, education and previous work experience, in light of a given RFC, and concludes with either disabled or not disabled.  Id.  The Grids take into account the difficulty of older claimants being able to adjust to new work, stating that the "adversity of functional restrictions to sedentary work at advanced age (55 and over) for individuals . . . who can no longer perform vocationally past work and have no transferable skills, warrants a finding of disabled."  Ross v. Astrue, No. 09-cv-11392-DJC, 2011 WL 2110217, at *12 (D. Mass. May 26, 2011) (quoting 20 C.F.R. Pt. 404, Subpt. P, App. 2).  Holmes's counsel submitted the Grids into the record and spoke briefly about their importance during the second ALJ hearing.  R. 192.  Counsel argued that due to Holmes's advanced age, high school education and either unskilled or semi-skilled previous work with non-

transferable skills, the Grids clearly warranted a finding of disabled regardless of whether the ALJ applied a sedentary RFC or a light RFC.  Id.

The ALJ acknowledged Holmes's advanced age and his high school education.  R. 35.  The ALJ accepted, over the objection of counsel, R. 187, the VE's opinion that Holmes's prior work as a receptionist was semi-skilled and that Holmes acquired various clerical skills during his time in that job.  R. 35-36.  While Holmes only appeals the issue of transferability of skills, the Court notes that the ALJ was well within his discretion, given the record, to accept expert vocational testimony—based off of Holmes's description of his work—that Holmes's prior work was semi-skilled and that Holmes obtained the specified clerical skills during the performance of his duties. See 20 C.F.R. § 404.1568; SSR 82-41, 1982 WL 31389, at *3-4; D. 13 at 25-27; R. 178-81.

Regarding transferability of skills, § 404.1568(d)(4) states that if a claimant is of advanced age, skills acquired from prior work will only be considered transferable if the new work "is so similar to [claimant's] previous work that [claimant] would need to make very little, if any, vocational adjustment in terms of tools, work processes, work settings, or the industry." 20 C.F.R. 404.1568(d)(4).  Holmes argues that the ALJ, rather than ask this question in its entirety to the VE, improperly abbreviated his question to "could you please provide me the jobs that would have very little to no vocational adjustment required."  D. 13 at 26; R. 182.  This paraphrasing, however, is not a fatal flaw to the ALJ's decision.

Holmes cites numerous cases in support of his contention that "courts have remanded cases where ALJs failed to comply with the Commissioner's regulation and ruling pertaining to transferability of skills for older claimants."  D. 13 at 27-28.  In each of these cases, however, the ALJ made an error such as failing to give reasons for concluding that the claimant would have to

make very little adjustment and failing to identify the skills that would transfer from past work, Abbot v. Astrue, 391 F. App'x 554, 558 (7th Cir. July 28, 2010); failing to make the requisite finding that the jobs proposed by the VE would require very little vocational adjustment, Daniels v. Astrue, 854 F. Supp. 2d 513, 527 (N.D. Ill. 2012); and failing to address whether a claimant about to reach advanced age would have to undergo more than minimal vocational adjustment, Bray v. Comm'r of Soc. Sec. Admin., 554 F.3d 1219, 1224-26 (9th Cir. 2009).  These errors came from the omission of material facts supporting the transferability of skills for older claimants.  No such error is present in this case.

The ALJ asked the VE to "[a]ssume if you will that a hypothetical person is of the same age, education, language and work background as the claimant."  R. 180.  The ALJ then provided a hypothetical set of limitations and asked the VE whether a person with such limitations would be able to perform any of the past work of the claimant.  Id.  The VE stated that the receptionist work previously performed by Holmes would fit within such limitations, that such work would be semi-skilled and that the skills acquired in the performance of that past work would include "[p]rimarily clerical skills … having a service orientation, actively looking for ways to help people[,]  [u]nderstanding written sentences, paragraphs in work-related documents[,] [c]ommunicating effectively with others [and] a knowledge of administrative and clerical procedures such as word processing systems, filing and records management."  R. 181.

The ALJ next asked the VE whether there would be any jobs available other than receptionist in the regional or national economy that would utilize the readily transferable skills indicated.  R. 182.  The VE responded affirmatively.  Id.  The ALJ then asked the question at issue: "[a]nd for the jobs that would be available utilizing the readily transferrable [sic] skills that you've indicated, could you please provide me the jobs that would have very little to no vocational

adjustment required."  Id.  The VE listed the jobs of appointment clerk, information clerk and credit reporting clerk as utilizing Holmes's readily transferable skills.  R. 182-83.  The ALJ asked if the job of travel clerk would also be available, which the VE declined to include based upon the claimant's limitations because "being a Travel Clerk would likely take additional training and would not really be readily transferrable [sic] from a Receptionist position."  R. 183-84.

The VE's testimony addressed Holmes's advanced age, specific transferable skills obtained at previous work and jobs that would take little to no vocational adjustment based upon those particular listed skills.  R. 177-84.  Although the ALJ did not ask about transferable skills using the exact language of the C.F.R., his question included the essential language of "very little to no vocational adjustment required" such that, in conjunction with the context of the questioning as a whole, the VE had adequate information to opine about the transferability of Holmes's skills.  See Abbott, 391 F. App'x at 558; 20 C.F.R. §§ 404.1566(e), 404.1568(d); SSR 82-41, 1982 WL 31389, at *3-4; R. 35-36.

Additionally, once the VE confirmed Holmes's prior work as semi-skilled and specifically identified the transferable skills obtained from said work, the ALJ would have been able to make a transferability determination simply by citing to the published Social Security Policy Statement SSR 82-41 relied upon by Holmes.  See D. 13 at 26; D. 22 at 26-27.  SSR 82-41 states that "where job skills have universal applicability across industry lines, e.g., clerical, professional, administrative, or managerial types of jobs, transferability of skills to industries differing from past work experience can usually be accomplished with very little, if any, vocational adjustment where jobs with similar skills can be identified as being within an individual's RFC."  SSR 82-41, 1982 WL 31389, at *6.  The SSR implies that, absent special circumstances, those job skills can be generally considered as readily transferable.  See id.; see also Morrow v. Colvin, No. 16-cv-00131-

27

DWC, 2016 WL 4193862, at *13 (W.D. Wash. Aug. 8, 2016).  There is nothing in the record that makes the SSR inapplicable in Holmes's case.

A reasonable mind, reviewing the record as a whole, could accept it as adequate to support the ALJ's conclusion that Holmes's past work and skills—in spite of his advanced age—were readily transferrable and that he did not qualify as disabled.  As such, the ALJ's opinion is supported by substantial evidence.  R. 35-36, 177-87.

4.      *The ALJ's Credibility Determination Was Supported by Substantial Evidence*

Holmes contends that the ALJ failed to provide substantial evidence supporting his credibility decision of Holmes's testimony.  D. 13 at 28.  Giving deference to the ALJ, his determination that Holmes's testimony was not credible is supported by substantial evidence. R. 33.

The Commissioner uses a two-step process to consider the statements or reports that a claimant provides regarding his or her symptoms and functional limitations. 20 C.F.R. § 404.1529(a); see Perry v. Colvin, 91 F. Supp. 3d 139, 148 (D. Mass. 2015).  First, the ALJ must find "a clinically determinable medical impairment that can reasonably be expected to produce the pain alleged."  Brown v. Colvin, 111 F. Supp. 3d 89, 99 (D. Mass. 2015) (quoting Avery v. Sec'y of Health & Human Servs., 797 F.2d 19, 21 (1st Cir. 1986)) (internal quotation marks omitted); see 20 C.F.R. § 404.1529(a).

Second, the ALJ must "evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit [his] function."  Alberts v. Astrue, No. 11-cv-11139-DJC, 2013 WL 1331110, at *12 (D. Mass. Mar. 29, 2013) (internal citations omitted).  This second step requires a finding regarding the credibility of the claimant's subjective

28

statements of pain and functional limitations based upon a consideration of the record as a whole. Brown, 111 F. Supp. 3d at 99.  An ALJ is to consider the factors from Avery, since codified, to evaluate the credibility of the claimant's subjective complaints.  See Avery, 797 F.2d at 29 (codified at 20 C.F.R. § 404.1529(c)(3)); Larlee v. Astrue, 694 F. Supp. 2d 80, 85 (D. Mass. 2010). These factors include:  (i) daily activities; (ii) the location, duration, frequency and intensity of pain or other symptoms; (iii) precipitation and aggravating factors; (iv) the type, dosage, effectiveness and side effects of any medication currently or previously taken to alleviate pain or other symptoms; (v) treatment, other than medication, currently or previously received for relief of pain or other symptoms; (vi) any measures currently or previously used to relieve pain or other symptoms, and; (vii) other factors concerning functional limitations and restrictions due to pain or other symptoms.  20 C.F.R. § 404.1529(c)(3)(i-vii).

If, after weighing the above factors, the ALJ chooses not to credit the claimant's subjective complaints, such credibility determination "must be supported by substantial evidence and the ALJ must make specific findings as to the relevant evidence he considered in determining to disbelieve the [claimant]."  Valiquette v. Astrue, 498 F. Supp. 2d 424, 430 (D. Mass. 2007) (quoting Da Rosa v. Sec'y of Health & Human Servs., 803 F.2d 24, 26 (1st Cir. 1986)) (internal quotation marks omitted); see Larlee, 694 F. Supp. 2d at 85.  "The credibility determination by the ALJ, who observed the claimant, evaluated his demeanor, and considered how that testimony fit in with the rest of the evidence, is entitled to deference, especially when supported by specific findings." Frustaglia v. Sec'y of Health & Human Servs., 829 F.2d 192, 195 (1st Cir. 1987).  If an examination of the entire record shows that the ALJ's specific findings are supported by substantial evidence, then the Court must defer to his judgment.  See id. (citing Grey v. Heckler, 760 F.2d 369, 372 (1st Cir. 1985)).

29

The ALJ's explanation for not crediting Holmes's testimony is such that "a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion." See Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981); R. 33.  Here, the ALJ found that Holmes's medically determinable impairments could be reasonably expected to cause the alleged symptoms in satisfaction of the first prong.  R. 33.  It is at the second step that the ALJ found Holmes's statements not credible.  Id.  Specifically, the ALJ focused on the inconsistencies between Holmes's testimony, his allegations of his functional limitations and his reports to treating sources.  Id.  In his explanation for not finding Holmes to be credible, the ALJ points to the facts that:  Holmes lives in a third floor apartment and must climb two flights of stairs to get to and from his apartment; he is able to prepare meals and clean his apartment as best he can; he goes to the supermarket by bus and walks to the corner store and library; and that he managed to maintain attention and concentration through the two hour and fifty minute hearing without needing to lay down.  Id.  The record also indicates that Holmes's reported pain levels average a three out of ten.  Id.

Holmes argues that each of the specific reasons given by the ALJ is incomplete, as each ignores critical relevant facts.  D. 13 at 28.  For instance, Holmes does live on the third floor of his building, but he has difficulty hauling laundry up the stairs, goes one step at a time down the stairs and hangs onto the hand rail "good and hard."  Id.  When he cleans his apartment, Holmes needs to use a long-handled mop and a long-handled broom with attached dustpan.  Id.  Holmes testified that he takes the bus to the grocery store because it is painful for him to walk the four blocks to its location, that it is painful for him to stand in the checkout line to pay and that he must lay down on the bus stop with his legs raised after shopping.  Id.  He walks a couple of blocks to the library, rests along the way because he knows all of the places he can sit down and sits down immediately

upon arriving.  Id.  After getting the mail each day, he immediately sits down and then lays down. Id.

The ALJ may have omitted some of these aspects of Holmes's testimony, but this is not a fatal flaw.  The ALJ acknowledged Holmes's difficulty and discomfort in undertaking daily tasks and also noted that Holmes alternated sitting and standing at will during the hearing.  R. 33.  The ALJ was within his discretion, however, given the factors listed in § 404.1529(c)(3), to consider Holmes's testimony regarding daily tasks when determining credibility.  See Teixeira v. Astrue, 755 F. Supp. 2d 340, 347 (D. Mass. 2010) (noting that "[w]hile a claimant's performance of household chores or the like ought not [to] be equated to an ability to participate effectively in the workforce, evidence of daily activities can be used to support a negative credibility finding").

A reasonable mind, examining the record as a whole, could accept the evidence cited by the ALJ as adequate for his credibility determination.  See Rodriguez, 647 F.2d at 222; R. 33.  The ALJ's decision cites to Holmes's testimony, acknowledges Holmes's discomfort and difficulty with everyday tasks and compares the subjective complaints against what little objective medical evidence appeared in the record.  R. 33.  The ALJ did not ignore evidence and his reasoning sufficiently demonstrates why he made each determination in his decision.  Id.  Thus, the ALJ's credibility determination is supported by substantial evidence.

## VI.     Conclusion

For the above reasons, the Court ALLOWS the Commissioner's motion to affirm, D. 21,

and DENIES Holmes's motion to reverse, D. 13.

**So Ordered.**


/s/ Denise J. Casper
United States District Judge